IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WILLIAM E. MATHEWS, JR. | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 8:16-cv-04013-PX |
| JOHNS HOPKINS HEALTH SYSTEM, CORP., *et al.*, | * | |
| | * | |
| Defendants. | | |

***

## **MEMORANDUM OPINION**

Pending before the Court is Defendants' motion for summary judgment. ECF No. 33. The motion is fully briefed, and no hearing is necessary. *See* Loc. R. 105.6. For the following reasons, Defendants' motion is GRANTED.

**I.  Background**

Plaintiff William E. Mathews, Jr. brings this employment discrimination action against Defendants, The Johns Hopkins Health System Corp. and Suburban Hospital (collectively, "Defendants"). Suburban Hospital ("Suburban") is located in Bethesda, Maryland and was acquired by The Johns Hopkins Health System Corp. ("JHHS") in 2009. ECF No. 33-16 at 17.

Mathews worked in the Maintenance Department at Suburban for 20 years until his termination on January 4, 2016. ECF No. 33-3 at 3–4, 19–20 (Mathews Dep.). For the last 11 years at Suburban, Mathews acted as the Maintenance Manager. *Id.* at 4. In that role, Mathews supervised 18 employees and was responsible for overseeing the Maintenance Department's daily operations and ensuring employee compliance with Suburban's policies and procedures. *Id.* at 4–5. Mathews reported to the Director of Maintenance, James Keyzer, who had been placed at Suburban as a contract employee of Sodexo Operations, LLC ("Sodexo"). *Id.* at 5.

Although Sodexo directly employed Keyzer, Keyzer reported to Joseph Linstrom, Suburban's Vice President of Operations. *Id.*

On December 21, 2015, two maintenance employees notified Mathews that they had discovered articles on a Department printer entitled "Top Ten Differences between White Terrorists and Others;" "Hate Groups for Dummies: How to Build a Successful Hate Group;" and "Study says White Extremists Have Killed More Americans in the U.S. than Jihadists." ECF No. 33-3 at 12–13; ECF No. 33-4 at 28. One of the employees who had found the articles believed a maintenance mechanic, Harshan Yakeem, had printed the documents because Yakeem had been seen sitting at one of the computers at the time. ECF No. 33-3 at 13. Mathews found the articles "very disturbing," and so he delivered them to Joseph Linstrom who said he would "launch an investigation." *Id.*

Linstrom, in turn, brought the incident to the attention of Wayne Stockbridge, the Senior Human Resources Director at Suburban. ECF No. 33-6 at 11 (Linstrom Dep.). Two investigators in Johns Hopkins' Department of Corporate Security, Gary Kulik and Ricky Mason, also became involved. ECF No. 33-10 at 3, 8 (Kulik Dep.). Kulik, Mason, and Stockbridge met at Suburban to begin interviewing employees about this incident. *Id.* at 7–9. By this time, Suburban's Information Technology Department had determined Yakeem did in fact access websites which included the articles. *Id.* at 8.

Kulik, Mason, and Stockbridge interviewed Yakeem who admitted that he printed the articles. Yakeem explained that he was seeking information about why "white people hate . . . others because of . . . religion." ECF No. 33-18 at 20 (Dec. 23 Interview Transcript). Yakeem, who immigrated to the United States from Sri Lanka in 1990, also told the investigators that members of the Maintenance Department called him "Osama Bin Laden" and "Taliban" (*id.* at

2

31), and that someone had taped to his locker a photograph of men who appeared to be terrorists. *See* ECF No. 33-5 at 2 (Picture of Yakeem's locker). When Yakeem removed the photo, another appeared in its place. ECF No. 33-10 at 15. Yakeem confirmed that Mathews knew about the harassing conduct but took no action. ECF No. 33-8 at 14; ECF No. 33-18 at 28, 32–33.

At the end of Yakeem's interview, the investigators and Stockbridge agreed that "the investigation had turned from a risk assessment" focused on the articles to a "personnel matter" concerning discriminatory actions of Department employees against Yakeem. ECF No. 33-10 at 10. With this new focus, Stockbridge and the investigators next interviewed Mathews. *Id.* at 23. On the topic of the employees harassing Yakeem, Mathews commented that "guys are guys, you know how guys are." ECF No. 33-12 at 18 (Mason Dep.). Mathews also recalled, in response to a question about whether Yakeem had been referred to as "Taliban," telling the investigators that another employee, Adrian Hernandez, had referred to Yakeem as "Taliban." ECF No. 33-3 at 15. Mathews reported that he had "verbally counsel[ed]" Hernandez about the impropriety of this comment. *Id.* at 20. Mathews did not identify any other steps that he took to deal with his employees' misconduct involving Yakeem.

Stockbridge and Linstrom also interviewed Gard Shoff, Yakeem's direct supervisor and one of the employees who initially brought the articles to Mathews' attention. ECF No. 33-14 at 12–13, 18 (Shoff Dep.). Shoff corroborated Yakeem's account of the name calling in the Maintenance Department. *Id.* at 5. Shoff said he heard workers use the slurs once or twice a week, which he believed made Yakeem uncomfortable at times. *Id.* at 10–11. He also confirmed that Mathews had witnessed what Shoff referred to as "joking" directed towards Yakeem but that Mathews did nothing to stop it. *Id.* at 6. Shoff also volunteered that he should have stood up and said something to curb this discriminatory behavior directed at Yakeem. *Id.* at

3

18.

Kulik summarized his findings from the interviews in "a short paragraph to the executive members of Suburban Hospital" and debriefed the executives in person. ECF No. 33-10 at 11–12, 20. Kulik concluded that Yakeem had been "working in a hostile work environment" and that, although the investigators believed that "any threat concerns [were] minimal," the Department had "management issues" that required attention. ECF No. 33-17 at 2. Stockbridge and Linstrom also met with Jackie Schultz, then-acting Chief Executive Officer of Suburban, and had a "full discussion about the findings." ECF No. 33-16 at 13. They determined that Mathews should be terminated because he failed to enforce Suburban's anti-harassment policy or take any meaningful steps to curb the employees' mistreatment of Yakeem. *Id.* at 14–15.

After Mathews returned from winter vacation on January 4, 2016, Schultz and Stockbridge terminated Mathews for "allow[ing] a hostile work environment." ECF No. 33-3 at 20 (Mathews Dep.). Mathews' supervisor, James Keyzer, was also replaced for failing to enforce Suburban's anti-harassment policy and for not properly supervising Mathews. ECF No. 33-20 ¶ 3.

On December 16, 2016, Mathews filed this action, alleging his termination violated the Age Discrimination in Employment Act ("ADEA") and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140.[1] Defendants now move for summary judgment on both counts. *See* ECF No. 33.

## II. Standard of Review

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the

---

[1] Mathews also alleged that Defendants conspired to violate the ADEA. That count was previously dismissed for failure to state a claim. *See* ECF No. 8.

movant to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).

Importantly, "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'" *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967)). Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is likewise warranted. *Celotex*, 477 U.S. at 322.

### III. Discussion

#### A. ADEA Claim (Count I)

Mathews contends Defendants terminated his employment because of his age, in contravention of the ADEA. *See* 29 U.S.C. §§ 623(a)(1); 631(a). To sustain an ADEA claim, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBI Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009) (rejecting "mixed-motives" age

5

discrimination claims, in contrast to Title VII discrimination claims). "An employer's reliance on factors that are analytically distinct from age in reaching the adverse decision rules out age as its but-for cause." *Bennett v. Kaiser Permanente*, 931 F. Supp. 2d 697, 705 (D. Md. 2013).

For ADEA claims based on circumstantial evidence as here, the Court uses the same burden-shifting framework as Title VII cases, established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Bodkin v. Town of Strasburg*, 386 F. App'x 411, 413 (4th Cir. 2010). To prevail under this framework, Mathews must first show: "(1) he is a member of a protected class—that is, 40 years or older; (2) he suffered an adverse employment action; (3) he was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or he was replaced by a substantially younger person." *Id.* at 413–14 (internal marks and citation omitted). If Mathews establishes a prima facie case, the burden shifts to Defendants to offer a legitimate, non-discriminatory reason for his discharge. *See Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). If Defendants offer such a reason, the burden shifts back to Mathews to raise a genuine dispute as to whether Defendants' proffered reason is mere pretext for discrimination. *See E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852 (4th Cir. 2001). Although the framework "involves a shifting back and forth of the evidentiary burden, [Mathews], at all times, retains the ultimate burden of persuading the trier of fact that the employer discriminated in violation of" the law. *Venugopal v. Shire Labs.*, 334 F. Supp. 2d 835, 841 (D. Md. 2004); *see also Moore v. Mukasey*, 305 F. App'x 111, 115 (4th Cir. 2008).

The parties do not dispute that Mathews is over forty years-old and that his discharge amounts to an adverse employment action. Defendants, however, argue that Mathews cannot sustain his prima facie case, and alternatively, that no evidence exists that his termination was

6

pretextual. Viewing the record evidence most favorably to Mathews, the Court agrees.

Regarding the third prong of the prima facie case, Defendants argue that Mathews cannot establish he was performing his job duties at a level that met the legitimate expectations of Suburban at the time he was discharged. On this prong, Mathews must demonstrate "that he was generally satisfying his employer's relevant, objective performance standards at the time of his termination." *Brown v. Siemens Healthcare Diagnostics, Inc.*, No. DKC 11-0769, 2012 WL 3136457, at *7 (D. Md. July 31, 2012).

Suburban's anti-harassment policy prohibits "[u]nwelcome oral or written communications of a vulgar, offensive or obscene nature, including epithets, slurs, comments, jokes, negative stereotypes or threats." ECF No. 33-4 at 5. Mathews, as Maintenance Manager supervising 18 employees, was tasked with enforcing the anti-harassment policy. His job required that he "report all complaints of harassment or discrimination" and "correct known misconduct even if an employee does not file an internal complaint." *Id.* at 7.

Yakeem recounted, and other Maintenance employees confirmed, that fellow employees voiced a slew of derogatory remarks directed at Yakeem, making it difficult for Yakeem to do his job. ECF No. 33-8 at 7–8, 10. Yakeem, who was raised Muslim, described one incident where a coworker said "we should put all the Muslims in an island and nuke them." *Id.* at 7, 10. The harassment took place in the open, before Department meetings and in the staff locker room. Yet Mathews took no further action to address the discriminatory conduct apart from having one conversation with one employee about one discriminatory comment. *See Brantley v. Nationwide Mut. Ins. Co.,* No. RDB-07-1322, 2008 WL 2900953, at *11 (D. Md. July 22, 2008) ("Noncompliance with company policy is a legitimate, nondiscriminatory reason for firing someone."). The evidence, therefore, demonstrates indisputably that Mathews did nothing to

7

address his employees' ongoing violations of this policy apart from having a single discussion with one employee who referred to Yakeem as "Taliban." ECF No. 38-1 ¶ 11. In management's view, Mathews actions were insufficient, and Mathews has generated no evidence to the contrary. ECF No. 33-3 at 20.

Mathews responds that he had no knowledge of his employees' offensive behavior, and so could not be reasonably expected to take any action. The record makes clear that as part of his job, Mathews was required to monitor shared work spaces where the offensive photos were displayed on Yakeem's locker and where ethnic slurs had been tossed about. ECF No. 33-16 at 10. As a result, Mathews' self-professed ignorance does not advance his argument, but rather supports that he failed to meet his employers' reasonable expectations.

Mathews next responds that his historic favorable job evaluations generate a genuine material dispute as to whether he was meeting legitimate employment expectations. ECF No. 38-1 ¶ 5. But historic positive performance generally does not negate, as a matter of law, an employee's failure to meet expectations at the time of termination. *See Mabry v. Capital One, N.A.*, No. GJH-13-02059, 2014 WL 6875791, at *4 (D. Md. Dec. 3, 2014) (citing *Brown*, 2012 WL 3136457, at *7). Put differently, past good conduct does not rebut Mathews' dereliction in failing to recognize and address adequately the workplace hostility directed at Yakeem. Accordingly, because Mathews was terminated for his failures in that respect, his prior job performance does not defeat summary judgment.[2]

---

[2] Defendants also argue that Mathews cannot sustain the fourth prong of the prima facie case—that after termination, his position was filled by a substantially younger person—because Sodexo, not Suburban, assumed the responsibility for staffing the position. ECF No. 33-20 ¶¶ 3–4. But where "the firing and replacement hiring decisions are made by different decisionmakers," the replacement hiring decision "has no probative value whatsoever as to whether the first individual's firing decision was motivated by the plaintiff's protected status." *Miles v. Dell, Inc.,* 429 F.3d 480, 489 (4th Cir. 2005). In this context, Mathews is relieved of his burden to establish this prong of the prima facie case. *See Lettieri v. Equant Inc.,* 478 F.3d 640, 648 (4th Cir. 2007) (applying exception where a different decisionmaker replaced plaintiff with someone outside of her protected class).

Alternatively, even if Mathews could prove his prima facie case, he has not generated any evidence to establish that Defendants' articulated reason for his discharge is pretextual. Defendants bear the initial burden "of production, not persuasion" in articulating legitimate grounds for Mathews' firing. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007); *see also Robinson v. Affinia Grp., Inc.*, 815 F. Supp. 2d 935, 943 (W.D.N.C. 2011) ("Defendant's burden is low such that it need *not* persuade the court that it was actually motivated by the proffered reasons so long as it otherwise articulates a legitimate reason that is supported by the evidence.") (internal marks and citation omitted). If Defendants meet this burden, then Mathews must show the stated reason for his termination amounts to a mere pretext for discrimination.

As to whether Mathews has generated sufficient evidence of pretext, he "must prove '*both* that the reason [for his termination] was false, *and* that discrimination was the real reason' for the challenged conduct." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (emphasis in original) (citation omitted). To support a finding of pretext, Mathews argues that the conduct in question did not constitute harassment, and even if it had, Mathews did not abdicate his duties as a manager by failing to do more regarding comments made about Yakeem.

Mathews' arguments are not persuasive. Under Suburban's harassment policy, Yakeem clearly experienced a level of unwelcome conduct in violation of the policy. Further, Defendants' investigation supported that Mathews did little to nothing to protect Yakeem from such conduct or otherwise address the situation. Thus, the evidence, viewed most favorably to Mathews, supports Defendants' proffered reason for terminating Mathews.

Mathews ironically focuses on whether Yakeem could make out a sufficient workplace harassment claim of his own. But this is not the proper inquiry. Rather, this Court must assess

whether any evidence suggests that Suburban terminated Mathews because of his age instead of his failure to address the harassment visited on one of his employees by the others. *See Holland*, 487 F.3d at 217 ("In assessing pretext, a court's focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible.") (citation omitted). Even if, as Mathews suggests, his termination was ill conceived, unfair, or even incorrect, the termination can be considered pretextual only where Mathews generates some evidence that Defendants lacked a good faith belief in the grounds for his termination. *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 903 (4th Cir. 2017) ("Whether the termination decision 'was wise, fair, or even correct' is immaterial.") (quoting *DeJarnette v. Corning Inc*., 133 F.3d 293, 299 (4th Cir. 1998)). Mathews has not generated any such evidence.

Mathews next argues that, as further evidence of pretext, the investigation which had been initially focused on the disturbing articles was "flawed." ECF No. 38 at 29. Mathews more particularly takes issue with Kulik not producing a full "written report" and that Stockbridge interviewed Shoff even though Stockbridge is not an investigator. But these facts do not demonstrate, in any way, that the stated reason for terminating Mathews was pretextual. An imperfect investigation alone cannot support a finding of pretext without some evidence that the termination was motivated by discriminatory animus. *See Brown v. Conopco, Inc.*, No. CCB-06-2668, 2007 WL 3224586, at *8 (D. Md. Oct. 24, 2007); *see also Bennett v. New Founds. Children & Family Servs., Inc*., No. 08-557-HFF-BHH, 2010 WL 517900, at *8 (D.S.C. Feb. 10, 2010) (pretext inquiry "does not convert Title VII into a vehicle for challenging unfair—but nondiscriminatory—employment decisions"). Because Mathews has failed to generate any evidence in this respect, his ADEA claim must fail.

Mathews next contends that he has generated a genuine dispute of fact as to pretext

10

because he can show that the company harassment policy had been applied disparately. As proof, Mathews highlights that none of his subordinates such as Shoff were disciplined for making derogatory comments to Yakeem. Because Mathews attempts to compare apples to oranges, this argument too must fail.

To sustain a discrimination claim based on disparate treatment, the court must first consider whether the plaintiff and the more favorably treated employee are proper comparators. Proper comparators "(i) held the same job description; (ii) were subject to the same standards; (iii) were subordinate to the same supervisors; and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019) (citation omitted). Of course, comparators need not be "precisely the same." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (quoting *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993)). But still, Mathews cannot defeat summary judgment unless he can show that he relies upon proper comparators.

Viewing the evidence most favorably to Mathews, he cannot sustain this burden. Mathews was the department manager, supervising 18 employees of whom Shoff was one. Unlike Shoff and others, Mathews was tasked with enforcing Suburban's anti-harassment policy. Shoff was also born in 1956, and so he too is a member of the protected class. ECF No. 39-1 ¶ 2. Thus, even if Shoff was somehow treated more favorably than Mathews, Shoff's protected status undermines rather than supports Mathews disparate treatment claim. *See Lawrence v. Veolia Transp. Servs., Inc.*, No. 07-2722-MBS, 2009 WL 857394, at *19 (D.S.C. Mar. 30, 2009); *Stoyanov v. Winter*, No. RDB 05-1567, 2007 WL 2359771, at *9 (D. Md. Aug. 15, 2007), *aff'd*,

266 F. App'x 294 (4th Cir. 2008).[3]

Mathews lastly argues that he has generated sufficient evidence of pretext when considering that Suburban fired him to save money. Mathews contends that Chase, his replacement, was paid nearly $20,000 less than Mathews' annual salary. ECF No. 38 at 31. Putting to the side whether such evidence alone is sufficient to prove pretext, *see Denio v. Asplundh Tree Expert Co.*, 92 F.3d 1177, at *3 (4th Cir. 1996) (table) ("Even though age is often related to factors such as salary, it is 'analytically distinct.'") (*quoting Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993)), the supposed cost savings is not supported by the record. The amended contract between Suburban and Sodexo resulted in Suburban paying *more* to staff the Maintenance Manager position. While Mathews' annual salary had been $104,000, Suburban paid Sodexo an additional $137,000 per year to Sodexo to assume this staffing responsibility. ECF No. 33-20 ¶ 4. Thus, no evidence supports that Mathews' firing "saved" the hospital any money.

In sum, when viewing the evidence most favorably to Mathews, he cannot demonstrate that at the time of his termination he had met Defendants' reasonable employment expectations. Alternatively, Mathews has generated no evidence that Defendants' stated reasons for his termination were pretextual. Defendants are entitled to summary judgment as to Mathews' ADEA claim.

### B. ERISA Claim (Count III)

Mathews' Section 510 ERISA claim is premised on the theory that his termination adversely affected his "pension entitlement and the amount of money he had planned to receive by retiring at the age of 66." ECF No. 1 ¶ 67. Section 510 prohibits discharging a participant or

---

[3] Mathews fails to mention that Keyzer, his direct supervisor, was also removed in response to the incident. *See* ECF No. 33-20 ¶ 3.

beneficiary "for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an employee benefit plan]." 29 U.S.C. § 1140. An employee may bring a private cause of action under this section where he can demonstrate that his discharge was designed "to prevent vesting in a qualified pension plan or [to] prevent accrual of additional benefits." *Goode v. Am. Veterans, Inc.,* 874 F. Supp. 2d 430, 452 (D. Md. 2012) (citing *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 236, 237–38 (4th Cir. 1991)). To sustain the claim, a plaintiff must demonstrate that the employer fired the employee with the specific intent to interfere with the employee's pension rights. *Conkwright*, 933 F.2d at 239. Terminations that visit an "an incidental, albeit important, effect on an employee's pension rights" are not actionable, as opposed to those terminations in which interference with an employee's pension was "a motivating factor in the firing decision." *Id.* at 238.

A discrimination claim brought under Section 510 employs the same *McDonnell Douglas* burden-shifting framework as ADEA and Title VII cases. *Id.* at 239. To establish a prima facie case, "an employee must demonstrate that (1) the employer performed a prohibited action (2) for the purpose of interfering (3) with the attainment of a right to which the employee is currently, or in the future may become, entitled." *Goode*, 874 F. Supp. 2d at 452–53. If the employee establishes the prima facie case, the burden shifts to the employer to state a legitimate, non-discriminatory reason for the adverse employment action, and ultimately to the employee to produce evidence of pretext. *Id.* at 453.

For the same reasons articulated previously, Mathews has not generated sufficient evidence to establish that his termination was a pretext for interfering with his pension rights. Mathews' sole contention in this regard is that Suburban saved money by firing him. Even if borne out by the evidence, which it is not, saving money generally does not demonstrate that the

13

hospital intended, even in part, to interfere with Mathews' pension rights. *See Conkwright*, 933 F.2d at 239 ("It is obvious that benefit costs make up a large amount of the costs of an employee to a company, and that pension rights are a substantial component of benefit costs, but these undeniable propositions are not sufficient standing alone to prove the requisite intent by the path of pretext."); *Goode*, 874 F. Supp. 2d at 453–54 (insufficient evidence of pretext even where the decision-makers' e-mails stated that plaintiff's termination would lead to cost savings). Mathews has failed to "adduce facts, which if taken as true, could enable a jury to identify unlawful intent from the other various reasons why an employer might have terminated plaintiff, and to conclude that the employer harbored the requisite unlawful intent." *Conkwright*, 933 F.2d at 239. Accordingly, Defendants are entitled to summary judgment on Mathews' ERISA claim.[4]

### IV. Conclusion

For the foregoing reasons, the Defendants' motion for summary judgment (ECF No. 33) is GRANTED. A separate Order follows.

| | |
|---|---|
| 8/13/2019 | /S/ |
| Date | Paula Xinis |
| | United States District Judge |

---

[4] Because the Court grants summary judgment for Defendants on all counts, it need not reach JHHS' additional arguments in favor of summary judgment. *See* ECF No. 33-1 at 28–31.